UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| D.E.,<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO, COMMISSIONER OF SOCIAL SECURITY;<br><br>Defendant. | 5:25-CV-05092-VLD<br><br>MEMORANDUM OPINION AND ORDER |

**INTRODUCTION**

Plaintiff, D.E., seeks judicial review of the Commissioner's final decision denying her application for Social Security disability benefits under Title II of the Social Security Act.[1] Plaintiff has filed a complaint and brief to reverse the

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Plaintiff filed her application for Title II benefits only. Docket No. 9, at 1; AR209. Her coverage status for SSD benefits expired on December 31, 2008. Docket No. 9, at 1; AR13. Put simply,

Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings. See Docket Nos. 1, 9. The Commissioner opposes that request. See Docket No. 14.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS

### A. Application for Disability

Plaintiff applied for disability benefits alleging a disability onset date of May 1, 2003.[2] Administrative Record ("AR") 209. Plaintiff's last date insured was December 31, 2008. AR13. Accordingly, the relevant timeframe for plaintiff's claim is May 1, 2003, to December 31, 2008. In other words, plaintiff becoming disabled *after* December 31, 2008, would not entitle her to benefits. See Bannister v. Astrue, 730 F. Supp. 2d 946, 951 (S.D. Iowa 2010) ("A claimant must establish disability prior to the expiration of her insurance to qualify for disability insurance benefits.").

to be entitled to Title II benefits, plaintiff must prove disability on or before that date.

[2] Plaintiff states that she waited so long to bring her claim for disability because she "had no idea that [she] could get disability as a young person. In [her] mind Social Security was only for older people." Docket No. 9, at 3; AR350.

The ALJ found that plaintiff had two severe impairments: dyspareunia[3] and vulvodynia.[4] AR13. The ALJ also found that plaintiff had the following nonsevere impairments: hypercholesterolemia,[5] preeclampsia,[6] headache, bradycardia,[7] and cervical disc bulge. Id.

**B. Medical Evidence**[8]

As mentioned above, the relevant timeframe for plaintiff's claim is May 1, 2003, to December 31, 2008. Accordingly, her medical history will be divided

---

[3] Dyspareunia is the medical term for lasting or recurrent genital pain that occurs just before, during, or after sex. Mayo Clinic, *Painful intercourse (dyspareunia)*, (Feb. 16, 2024) https://www.mayoclinic.org/diseases-conditions/painful-intercourse/symptoms-causes/syc-20375967.

[4] Vulvodynia "is a type of long-term pain or discomfort around the outer part of the female genitals" that "lasts at least three months and has no clear cause." Mayo Clinic, *Vulvodynia*, (Sept. 1, 2023) https://www.mayoclinic.org/diseases-conditions/vulvodynia/symptoms-causes/syc-20353423.

[5] "Hypercholesterolemia is a lipid disorder in which your low-density lipoprotein (LDL), or bad cholesterol, is too high." Cleveland Clinic, *Hypercholesterolemia*, (Aug. 1, 2022) https://my.clevelandclinic.org/health/diseases/23921-hypercholesterolemia.

[6] Preeclampsia is a complication of pregnancy that can cause high blood pressure, protein in urine, swelling, headaches, and blurred vision. Cleveland Clinic, *Preeclampsia*, (May 28, 2024) https://my.clevelandclinic.org/health/diseases/17952-preeclampsia.

[7] Bradycardia is a slow heart rate of fewer than 60 beats per minute. Mayo Clinic, *Bradycardia*, (Dec. 13, 2024) https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474.

[8] Because plaintiff's legal arguments focus on her dyspareunia, vulvodynia, and allergic reactions, the court recounts primarily the medical history involving those conditions.

into three categories: evidence from before the relevant time period, evidence from the relevant time period, and evidence after the relevant time period.

**1. Evidence from before May 1, 2003**

On February 27, 1995, plaintiff had a perineoplasty[9] for vulvar vestibulitis. AR1084. Plaintiff was in "satisfactory condition" at the end of the operation. Id.

Plaintiff presented to providers at Johns Hopkins Hospital on February 28, 1995, complaining of vaginal and perineal itching and soreness after horseback riding. AR1082. Plaintiff reported burning with each menstrual cycle. Id. The burning resumed in December 1994 after a two-year period of abstinence from intercourse. Id.

Plaintiff was seen by providers at Johns Hopkins on November 18, 2002. AR1080. Plaintiff complained of vulvar pruritus and irritation since October 1 of the previous year. Id. Plaintiff stated that she wore cotton underwear and used only unscented soaps. Id. Providers described plaintiff as "an anxious young lady in no acute distress." AR1081. A pelvic examination revealed a vulva with no evidence of laceration or lesions. Id.

Plaintiff met with Dr. Spyridon Marinopoulos on February 14, 2003. AR366, 1077. At that appointment, plaintiff complained of severe vulvodynia

---

[9] Perineoplasty is a surgery that aims to strengthen and tighten one's perineum. It can also repair loose, scarred, or damaged skin around one's vagina. Cleveland Clinic, *Perineoplasty*, (Dec. 11, 2025) https://my.clevelandclinic.org/health/treatments/23183-perineoplasty.

since October 1, 2002. AR367.[10] Plaintiff attributed her vaginal pain to having an allergic reaction. Id. Plaintiff reported that she was allergic to the medications she had used to treat her symptoms. Id. She also stated that she was struggling with anxiety and migraines. AR368.

**2. Evidence from May 1, 2003, to December 31, 2008**

Plaintiff was seen at the Greater Baltimore Medical Center beginning August 6, 2004, primarily for treatment regarding pregnancy and childbirth. AR965 (Exhibit No. 22f). The records include notes that plaintiff was "doing well" and that she had no prenatal complications. AR968, 976. The records also mention a cyst that was removed from around plaintiff's left ovary. AR986.

In April of 2007 plaintiff was seen for pain behind and under her eyes from what she believed to be a sinus infection. AR1046. Providers noted that plaintiff was "otherwise doing well." AR1054.

**3. Evidence from after December 31, 2008**

Plaintiff was seen at the Milton S. Hershey Medical Center in Hershey, Pennsylvania on February 6, 2012, for swelling on the right side of her face. AR761. Her lips were swollen and her right eye was swollen shut. Id.

Plaintiff met Dr. Thomas Grana on May 27, 2015. AR391. Plaintiff reported vulvovaginal tenderness, but Dr. Grana stated that "these symptoms have been relatively mild for [plaintiff] in recent months, and her principal symptom components are itching that occurs 4-5 days before her menstrual

[10] The record says, "since 10/01," but it is clear plaintiff was referring to October 1 of the previous year.

period, and a few days after, as well as mild soreness shortly after intercourse." Id. Dr. Grana elaborated that "at one time in [plaintiff's] life, it was quite severe." Id.

Plaintiff underwent a hysterectomy on March 19, 2019. AR402-03, 461. All records indicate that the surgery was completed without issue. Id.

On March 2, 2020, plaintiff was seen again at the Milton S. Hershey Medical Center, with her chief complaint being vaginal burning. AR392. She reported "vulvovaginal itching, burning, and vulvar pain where she 'feels on fire.' " Id. The notes from her appointment state that plaintiff underwent a vestibulectomy[11] in 1993 for symptoms of erythema. Id. Plaintiff complained of "itching along the hood and anterior vestibule." AR393.

Plaintiff was seen by Dr. Richard Beasley on June 27, 2022, for establishing care regarding a diagnosis of mass cell activation syndrome (MCAS).[12] AR444. Dr. Beasley reported that plaintiff was not "able to tolerate most foods or medications." Id. Plaintiff was taken off her anxiety medication but started taking it again after one month due to severe anxiety. Id. Plaintiff complained of severe diarrhea and gastrointestinal symptoms. Id. Plaintiff was

---

[11] A vestibulectomy is a procedure to remove tissue from one's vaginal opening. It is a treatment for people with vestibulodynia. Cleveland Clinic, *Vestibulectomy*, (June 3, 2024) https://my.clevelandclinic.org/health/procedures/vestibulectomy.

[12] Mast cell activation syndrome (MCAS) is a rare condition caused by overactive mast cells. It can lead to episodes that may include swelling, hives, trouble breathing, diarrhea, vomiting, and life-threatening anaphylaxis. Cleveland Clinic, *Mast Cell Activation Syndrome*, (June 17, 2026) https://my.clevelandclinic.org/health/diseases/mast-cell-activation-syndrome.

seen several other times by Dr. Beasley regarding her vaginal pain and MCAS. AR631, 635, 639, 648, 678, 686.

Plaintiff was seen by Dr. Brook Eide at the Rapid City Hospital Emergency Department on September 20, 2023. AR899. Plaintiff complained of a recurrence of hives over the past week and noted that she "has been getting hives intermittently for the past few years" for an "unknown reason." Id.

On most occasions in 2009 and beyond, plaintiff's complaints to medical providers did not include vaginal pain or trouble sitting.

**i. Dr. Kroopnick Report**

Dr. Robert Kroopnick prepared a report regarding plaintiff's health on July 20, 2023. AR653. Dr. Kroopnick reported that plaintiff's "major problem is mast cell hyperactivity [which] precipitate[s] horrible hives and rash[es] all over her body which has necessitated at times admission to the hospital for . . . treatment with intravenous epinephrine, histamines, and steroids." Id. Dr. Kroopnick stated that plaintiff is "unable to be gainfully employed permanently." AR653-54.

Importantly for this appeal, Dr. Kroopnick's report does not mention treating plaintiff before July 20, 2023. AR653-55.

### C. Non-Medical Evidence

#### 1. Plaintiff's Function Report

Plaintiff filled out a function report describing her conditions and daily activities. AR286-93.[13] Plaintiff wrote that she cannot sit or stand for long periods and cannot sit in a regular chair. AR286. Plaintiff reported that she was able to participate in some daily activities, such as caring for her children, walking, going to church, and traveling. AR290. Plaintiff attached a list of allergies with over twenty items listed. AR294. She also provided a long list of the medications she was on and her accompanying medical conditions. AR295-96.

#### 2. L.E.'s Letter

Plaintiff's husband, L.E., submitted a letter describing plaintiff's health and daily activities. AR339. L.E. stated that in the 23 years he had been in a relationship with plaintiff, she suffered from "female health and allergy issues." Id. He noted that plaintiff cannot participate in activities like riding bicycles, taking baths, or swimming. Id. She also often must lie down in the back seat when taking long car rides as she cannot stay seated upright. Id. She requires 100% cotton underwear and cannot use laundry detergent that has any fragrance or color. Id. L.E. also described plaintiff's struggles post-pregnancy, which included being bedridden, having post-partum depression, heart enlargement, and toxemia. Id.

---

[13] The record is unclear when plaintiff filled out her report. Under "date," plaintiff erroneously wrote her birthdate rather than the current date. AR293.

**3. M.S. Letter**

Plaintiff's sibling, M.S., also provided a letter. AR340. She stated that "for as long as [she] could remember," plaintiff has suffered migraines, vulvodynia, and allergies. Id. M.S. recounted having to care for plaintiff, which included providing her icepacks, changing her sheets, and cooking for her. Id. Plaintiff could only use certain soaps, detergents, and toilet paper, and could not wear undergarments or pants. Id.

M.S. stated that plaintiff struggled to keep employment because she is unable to sit, stand, or walk for extended periods. M.S. elaborated that plaintiff's 2003 pregnancy exacerbated her symptoms and required extensive family support. Id. M.S. also stated that plaintiff "has recently been diagnosed with mast cell activation and her doctor suspects that this has been the reason [for her condition] all along." Id.

**4. D.B.P. Letter**

D.B.P., another of plaintiff's siblings, also submitted a letter. AR341. D.B.P. stated that during plaintiff's teenage years she suffered from severe burning, itching, and painful swelling of her vaginal area, preventing her from doing activities such as riding a bike or going swimming. Id. Plaintiff could not wear tight clothing or clothing with dyes and could only wear cotton undergarments. Id. D.B.P. often had to care for plaintiff while she lay in bed, which included giving her icepacks around the clock, changing her sheets, helping her to the bathroom, and cooking for her. Id. D.B.P. also described plaintiff's debilitating migraines during her menstrual cycles. Id. Like M.S.,

D.B.P. described the extensive family support plaintiff required after having a child. Id.

**D. Plaintiff's Hearings Before the ALJ**

Plaintiff had two hearings before the ALJ: an initial hearing on January 23, 2024, and a supplemental hearing on June 20, 2024. AR10.

**1. January 2024 Hearing**

The first hearing was held by telephone; plaintiff was represented by her non-attorney representative, Lawrence Pucci. AR67. Vocational expert (VE) Karen Black was also present. Id.

At the hearing, plaintiff's representative first discussed that after 2008, plaintiff was diagnosed with mass cell action syndrome, and that those symptoms were present before plaintiff's date last insured. AR70-71. The ALJ next began asking plaintiff questions regarding her education and work history. AR72-73. Plaintiff described that she had to leave her job at Walgreens in 1997 because of her "flare ups" and a job as a travel agent for Carnival Corporation in 1999 because sitting too long led to "a flare." AR73-74. She similarly lost jobs because of flare ups in 2002 at Baltimore Washington Medical Center and in 2003 at Quest Diagnostics. AR75-76.

Plaintiff's representative then questioned her about her work history since 2003. AR76. Plaintiff explained that she had a roughly three-month long flare up in which she could not leave her bed. Id. Plaintiff recounted being diagnosed with vulvodynia when she was 15, which prevented her from participating in normal activities like swimming, sitting, and riding a bike.

AR78. She said she "always ha[d] to either be in a reclining position or laying down or sitting on the back part of [her] buttocks." Id. She also mentioned that a "doctor here has said that I might have had mass cell activation syndrome all along." AR80. Plaintiff's representative asked how long she could sit in a "regular chair" and plaintiff responded that she could not—which is why she typically uses a recliner. AR82.

Plaintiff also described her "debilitating" migraines, which cause her to be unable to hear or smell. AR84. While she tries to manage these migraines by lying in a dark cool room with a pillow wrapped over her head, sometimes she ends up in the emergency room because she cannot stop vomiting. Id. She stated that between May 2003 and December 2008, she was having about one migraine a week, which could last from one to two days. AR85. Plaintiff also described her issues with anxiety and depression. AR85-88.

**2. June 2024 Hearing**

The supplemental hearing was held on June 20, 2024, before the plaintiff, her non-attorney representative, and VE Mark Schwager. AR47. The ALJ explained that following the initial hearing, additional medical records were discovered. AR50. Those records were from the Greater Baltimore Medical Center from August of 2004 through April of 2007. AR50 (Ex. 22F, see AR965-1070). Plaintiff also provided two of her own exhibits. (Exs. 23F and 24F, AR1071-89).

Plaintiff again described her past work, recounting that she left her job at Quest Diagnostics because her pain was too severe and caused her to miss

work. AR55. Plaintiff also recounted her struggles with pregnancy and post-delivery complications. AR57-58. She further described her more recent diagnosis by Dr. Richard Beasley who said that plaintiff has mast cell activation and that she "probably had [it] all along." AR58.

The ALJ next questioned VE Schwager. The ALJ presented the following hypothetical:

> Assume a hypothetical individual, a younger individual with the same education at the high school level with the same work history as previously – or just described. I'd like you to further assume that the hypothetical person is able to lift and carry up to ten – twenty pounds occasionally, ten pounds frequently, is able to stand or walk for a total of about six hours during an eight-hour day with normal breaks, is able to sit for a total of about four hours during an eight-hour day up to thirty minutes at one time, is able to occasionally climb ladders, ropes, scaffolds, frequently climb ramps and stairs, frequently balance, stoop, kneel, crouch, and crawl. The person can have occasional exposure to atmospheric conditions such as noxious odors, fumes, dust, and gases. Could such a person perform [plaintiff's] past work either as she performed it or per the DOT?

AR63. VE Schwager responded that the hypothetical individual could not, because the past work requires sitting longer than four hours out of eight. Id. However, VE Schwager provided other jobs that the individual could do, including room cleaner,[14] bench assembler,[15] and office helper.[16]

---

[14] DOT 323.687-014, light, SVP 2.

[15] DOT 706.684-042, light, SVP 2.

[16] DOT 239.567-010, light, SVP 2.

**E. The ALJ's Decision**

On July 24, 2024, the ALJ denied plaintiff's application for benefits in a written decision. AR10-18. The ALJ found that plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2008." AR11. The ALJ next noted that plaintiff had not engaged in substantial gainful activity from her alleged disability onset date of May 1, 2003, through her date last insured of December 31, 2008. AR13. The ALJ determined that plaintiff had the severe impairments of dyspareunia and vulvodynia, and the non-severe impairments of hypercholesterolemia, preeclampsia, headache, bradycardia, and cervical disc bulge. Id.[17] The ALJ next found that none of plaintiff's impairments "met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." AR14.

Next, the ALJ found that plaintiff had the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk up to six hours total in an eight-hour workday with normal breaks. She can sit up to four hours in an eight-hour workday and up to 30 minutes at one time. The claimant can occasionally climb ladders, ropes, and scaffolds, frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl. She can have occasional exposure to atmospheric conditions such as noxious odors, fumes, dusts, and gases.

Id.

The ALJ noted the two-step process he was required to follow in considering plaintiff's symptoms:

[17] The ALJ also found that "claimant's history of anxiety . . . did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." AR13.

> In considering the claimant's symptoms, I must follow a two-step process in which it must be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

AR14-15. In accordance with that two-step framework, the ALJ next considered plaintiff's accounts of her impairments. Id.

At the initial hearing, plaintiff stated that "she had flare ups of her symptoms that prevented her from working." AR15. She "said she had multiple flare ups of vulvodynia that caused her to be in bed all day" and prevented her from sitting for extended periods. Id. She claimed that these flare ups would sometimes last two or three weeks at a time. Id. She also reported symptoms from other impairments, which included headaches, anxiety, and panic attacks. Id. At the supplemental hearing, plaintiff stated that she could "not ever sit flat on her bottom and could sit for maybe 20 minutes, and she would have to shift her weight from one side to another." Id. She said she could not exercise and that if she stood for too long her pain got worse. Id.

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, he found that

plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the medical and record evidence. Id.

First, the ALJ stated that plaintiff's treatment history does not contain reports of symptoms as severe as plaintiff alleged, and clinical findings do not support additional limitations. Id. The ALJ noted that the record contained very little evidence prior to the plaintiff's date last insured of December 31, 2008. Id. He recounted that plaintiff underwent perineoplasty surgery in 1995 to address vulvar vestibulitis, and was diagnosed in 2002 with "vulvodynia associated with a history of dyspareunia and recent vulvar pruritus, evidence of LAS and severe vaginismus, history of anxiety and multiple allergies to medications." Id.

During the relevant time period, in February 2003, plaintiff met with a medical provider regarding multiple allergic reactions and vulvodynia/dyspareunia. Id. She reported "severe vulvodynia" and inflammation of the vulva and genital area since October 2021, which she attributed to an allergic reaction. Id. The ALJ noted other sparse medical records from the relevant time period, including: treatment for pregnancy in August 2004, the removal of a left ovary with benign fibrothecoma[18] in August 2004, another pregnancy and delivery in April 2007, and headaches in April 2007. AR16. The ALJ noted that "the majority of the medical evidence from the

[18] Fibrothecoma is a rare benign ovarian tumor. Gehad Saleh et al., *Fibrothecoma of the Ovary; Clinical and Imaging Characteristics*, (Mar. 25, 2025) https://pmc.ncbi.nlm.nih.gov/articles/PMC12040543/.

relevant time period does not include any complaints by the claimant that she is unable to sit or stand for more than a short period as she alleged." Id.

The ALJ considered the 2023 statement of Dr. Kroupnick and found it not persuasive:

> The 2023 statement of Dr. Kroopnick is not persuasive. Dr. Kroopnick opined the claimant was incapable of even sedentary work and would be absent five days each month and off task 50% of the time. However, Dr. Kroopnick did not provide a description of supportive medical findings. In addition, the opinion comes 15 years after the date last insured and does not reference the relevant time period or any findings from that period. **There is no evidence Dr. Kroopnick even knew the claimant during the period at issue**, which ended in 2008.

Id. (emphasis added) (spelling altered).

The ALJ next moved on to step four of the analysis, determining that through the date last insured, plaintiff was unable to perform any past relevant work, including her previous job as a data entry clerk. Id. Finally, the ALJ concluded that through the date plaintiff was last insured, there were jobs that existed in significant numbers in the national economy that she could have performed. AR17. Those jobs included room cleaner,[19] bench assembler,[20] and office helper.[21] Id.

**F. November 2024 Supplement from Dr. Kroopnick**

In October 2024, plaintiff's attorney sent a letter to Dr. Kroopnick. AR41. This letter informed Dr. Kroopnick that the ALJ issued an unfavorable

---

[19] DOT 323.687-014, light, SVP2.

[20] DOT 706.684-042, light, SVP2.

[21] DOT 239.567-010, light, SVP2.

decision, in part because there was no evidence that Dr. Kroopnick treated plaintiff during the relevant time period. Id. Plaintiff's attorney requested that Dr. Kroopnick answer questions elaborating on his relationship with plaintiff prior to 2008. Dr. Kroopnick stated in response that he

> treated [plaintiff] as a young girl for what I thought at that time was severe allergic rhinitis and chronic illness which became incapacitating intermittently, especially during the change in seasons in Maryland. These include but [are] not limited to wheezing, watery eyes, runny nose, low grade fevers, coughing, chills, and lingering malaise. Sometimes emergency room visits were needed. Loss of the ability to daily enjoy the activities of daily living eventually compelled her to change climate living to a colder less allergic environment like South Dakota. Retrospectively I believe that she was suffering fro[m] MCAS [(mast cell activation syndrome)].

AR42.

One portion of the letter informed Dr. Kroopnick that one of plaintiff's other doctors believed that plaintiff had been suffering from MCAS "for years and years and was likely the cause of her debilitating allergies and rashes and symptoms she has been complaining of since she was approximately 15 years old." Id. It then asked whether Dr. Kroopnick had an opinion on "whether [plaintiff] was in fact suffering from MCAS before December 2008?" Id. Dr. Kroopnick responded "yes" and wrote that "her severe allergies sometimes causing hospital evaluations are typical of this diagnosis. Unrelenting lifetime problem which was not relieved significantly from medications and never getting well. Symptoms are triggered by environment changes, food, stress, and many other unknown triggers are symptoms of a severe allergic reaction such as MCAS." Id.

The letter next asked Dr. Kroopnick whether plaintiff's diagnosis and impairments caused functional limitations; Dr. Kroopnick responded "yes" and wrote "the functional impairments limited her ability to be gainfully employed. During periods of the triggering of her symptoms especially Spring and Fall she would be unemployable." Id. Dr. Kroopnick elaborated that during the relevant time period, plaintiff would need to be off task 25% or more, would need to miss more than four days of work per month, and would need to take frequent breaks. AR43-44.

Dr. Kroopnick's supplement was submitted to the Appeals Council after November 2, 2024. AR45; Docket No, 9, at 4. Because the ALJ issued his decision on July 24, 2024, he had no opportunity to review or consider Dr. Kroopnick's supplement.

## DISCUSSION

### A. Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole." 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)). "[S]ubstantial evidence [is] defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "This review is more than a search of the record for evidence supporting the

[Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted). Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination. Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th

Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B. The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

### C. Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

### D. Assignments of Error

#### 1. Whether the ALJ's Rejection of Dr. Kroopnick's Opinion Was Based on a Factual Error

A key issue in this appeal is the lack of medical records from the relevant time period. Plaintiff explained in an email to her attorney that while she went to "great lengths" to obtain certain medical records, the records had been destroyed because the relevant hospitals and doctors "do not hold on to records dating back that far." AR342.

In rendering his opinion, the ALJ considered the 2023 statement of Dr. Kroopnick and found it not persuasive:

> The 2023 statement of Dr. Kroopnick is not persuasive. Dr. Kroopnick opined the claimant was incapable of even sedentary work and would be absent five days each month and off task 50% of the time. However, Dr. Kroopnick did not provide a description of supportive medical findings. In addition, the opinion comes 15 years after the date last insured and does not reference the relevant time period or any findings from that period. **There is no evidence Dr. Kroopnick even knew the claimant during the period at issue**, which ended in 2008.

AR16 (emphasis added) (spelling corrected).

Plaintiff argues that this was a factual error because Dr. Kroopnick submitted a supplement several months after the ALJ issued his order, clarifying that he treated plaintiff prior to 2008. Docket No. 9, at 11; AR42. Accordingly, plaintiff contends that the ALJ's opinion was not supported by substantial evidence. Id.

The ALJ cannot be faulted—and did not commit reversible error—for finding that there was no evidence that Dr. Kroopnick treated plaintiff during the relevant time period. After all, at the time the ALJ wrote his opinion, there *was* no such evidence. It was only after plaintiff was notified of the unfavorable decision that her attorney solicited additional evidence from Dr. Kroopnick. "[T]he burden is on the claimant to show the existence of a disability on or before the date that the insurance coverage expires." Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Accordingly, it was the plaintiff's burden to produce evidence demonstrating that Dr. Kroopnick treated plaintiff during the relevant period.

In short, the ALJ cannot be faulted for failing to consider evidence which did not exist at the time he wrote his opinion. The court finds that the ALJ did

not err with respect to his analysis of Dr. Kroopnick's opinion based on the record that was before the ALJ at the time.

### 2. Whether the ALJ Failed to Properly Evaluate Retrospective Medical Opinions

Plaintiff next argues that the ALJ erred when he discounted Dr. Kroopnick's 2023 opinion because it came "15 years after the date last insured and d[id] not reference the relevant time period." Docket No. 9, at 13 (quoting AR16). Plaintiff contends that this was erroneous because "retrospective medical opinions are permissible and can be highly probative when supported by the record." Id. See Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995) (noting that "retrospective medical diagnoses constitute relevant evidence of pre-expiration disability" and finding an ALJ erred by failing to discuss retrospective medical diagnoses suggesting an impairment during the insured period).

Plaintiff's argument is unpersuasive. The ALJ did not discount Dr. Kroopnick's opinion solely on the basis that it was rendered 15 years after the date last insured. Rather, the ALJ wrote that "in addition" to Dr. Kroopnick not "provid[ing] a description of supportive medical findings," the ALJ also discounted the opinion because it "comes 15 years after the date last insured *and does not reference the relevant time period or any findings from that period.*" AR16 (emphasis added).

The ALJ was entitled to discount Dr. Kroopnick's opinion on that basis. While an ALJ may not "discount or reject [a doctor's] opinion solely because they were rendered after the [date last insured] . . . an ALJ may reject a

medical opinion, even that of a treating physician, that does not relate plaintiff's current symptoms back to the relevant time period." Ellen G. v. Saul, 404 F. Supp. 3d 1261, 1266-67 (C.D. Cal. 2019) (cleaned up, quotation omitted). See also Denison v. Berryhill, No. C16-6047-MAT, 2017 WL 3592454, at *3 (W.D. Wash. Aug. 21, 2017) (post date of last insured "opinions may be properly discounted . . . where the opinion does not have retrospective applicability").

That rule makes sense. After all, evidence that someone is currently disabled is not probative of whether that individual was disabled 15 years ago, as health conditions can emerge or worsen over time. Accordingly, the ALJ was entitled to discount Dr. Kroopnick's opinion on the basis that it did not reference the relevant time period. The ALJ did not, as plaintiff implies, discount Dr. Kroopnick's opinion on the sole basis that it was given recently; rather, it is the lack of a nexus between the relevant time period and Dr. Kroopnick's opinion that allowed the ALJ to discount it. Accordingly, the court finds that the ALJ did not err in discounting Dr. Kroopnick's opinion based on the evidence that was before him at the time.

### 3. Whether the ALJ's RFC Finding is Supported by Substantial Evidence

The ALJ determined plaintiff's RFC to be:

> [P]erform light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk up to six hours total in an eight-hour workday with normal breaks. She can sit up to four hours in an eight-hour workday and up to 30 minutes at one time. The claimant can occasionally climb ladders, ropes, and scaffolds, frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl. She can have occasional exposure to

atmospheric conditions such as noxious odors, fumes, dusts, and gases.

AR14.

Plaintiff argues that this RFC is not supported by substantial evidence. She says that while the ALJ acknowledged that plaintiff had "severe vulvodynia," he concluded her testimony was inconsistent because the records "do not include complaints by the claimant that she is unable to sit or stand for more than a short period." Docket No. 9, at 16 (quoting AR15).

Plaintiff contends that this was erroneous for three reasons. First, plaintiff says that vulvodynia by its nature causes pain with prolonged sitting. Id. This argument is unpersuasive. As the government points out, "the mere diagnosis of an impairment does not establish that the impairment results in any significant functional limitations." Docket No. 14, at 18. See Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 731 (8th Cir. 2003) (noting that the regulations state that an impairment will not be found disabling solely because it has the diagnosis of a listed impairment—it must also have the findings shown in the listing for that impairment). See also Callahan v. Kijakazi, 657 F. Supp. 3d 1368, 1382 (E.D. Cal. 2023) ("[M]ere diagnosis alone is not sufficient to establish a medically determinable impairment, let alone functional limitations.").

Second, plaintiff argues that the ALJ's own RFC limits sitting to 30 minutes at a time, implicitly acknowledging sitting limitations. Docket No. 9, at 16. This argument is likewise unpersuasive. The ALJ found that plaintiff's "treatment history does not contain reports of symptoms *as severe* as [plaintiff]

alleged." AR15 (emphasis added). That does not mean that the ALJ determined that plaintiff had no limitations whatsoever. So while plaintiff is correct that the ALJ's RFC limits on sitting more than 30 minutes at a time "acknowledg[es] sitting limitations," plaintiff is incorrect that that acknowledgment demonstrates that the ALJ erred.

Finally, plaintiff states that the absence of specific complaints in the record does not negate the existence of symptoms consistent with a documented diagnosis. Docket No. 9, at 16. But the absence of corroborating medical evidence is not the ALJ's error, and the burden to establish plaintiff's RFC rests on the plaintiff, not the ALJ. Barrett, 38 F.3d at 1024. Further, there is no reason to assume that plaintiff's lost medical records would support her claim of disability; indeed, it is possible that the records would undermine her claim.

The ALJ's RFC finding is supported by substantial evidence. The ALJ considered plaintiff's hearing testimony regarding the severity of her symptoms and compared it to the record evidence. AR15. The ALJ concluded that plaintiff's statements were inconsistent because her treatment history did not contain reports of symptoms as severe as she alleged, and clinical findings did not support additional limitations. Id. The ALJ noted that "[t]he majority of the medical evidence from the relevant period does not include any complaints by the claimant that she is unable to sit or stand for more than a short period as she alleged," which was "not consistent with her testimony." AR16. The ALJ

also found Dr. Kroopnick's opinion to be unpersuasive for the reasons stated above. Id.

Given the dearth of medical evidence provided by plaintiff, it is inevitable that the ALJ's RFC finding would not be supported by voluminous medical records. The burden is on the plaintiff at the RFC stage, and plaintiff failed to provide the necessary support for her claims. Accordingly, the court finds that the ALJ's RFC finding is supported by substantial evidence based on the evidence before him at the time. See Greenwood v. Barnhart, 433 F. Supp. 2d 915, 929-30 (N.D. Ill. 2006) (holding that ALJ did not err in finding plaintiff not credible where there was a "dearth of a single opinion that substantiated [plaintiff's] alleged limitations").

**4. Whether the ALJ Failed to Properly Evaluate MCAS as a Medically Determinable Impairment**

Plaintiff next argues that the ALJ erred by failing to address whether Mast Cell Activation Syndrome (MCAS) was a medically determinable impairment during the relevant period. Docket No. 9, at 17. The ALJ's discussion of plaintiff's severe impairments at step two of the analysis contains no discussion of MCAS. AR13-14. Plaintiff says that the ALJ was required to consider MCAS because: (1) plaintiff testified that doctors believed she "might have had mast cell activation all along," AR58, (2) Dr. Kroopnick's retrospective opinion that her symptoms were consistent with MCAS, AR41-46, and (3) medical literature supporting the connection between MCAS and vulvodynia, AR351-57, 358-61. Docket No. 9, at 17.

During the relevant time period for determining whether plaintiff was disabled, MCAS had yet to be discovered. "The condition was first proposed in 2013,"[22] after plaintiff's date last insured of December 31, 2008. Accordingly, plaintiff's healthcare providers had no reason to think her symptoms were caused by MCAS during the relevant period. It was only after the time period elapsed that doctors speculated that she "might have had mast cell activation all along." AR58.

"[A]n ALJ is not obligated to take into consideration impairments which are not medically determinable impairments, because only medically determinable impairments can be considered severe or non-severe." Talbot v. Colvin, No. 3:13-CV-1249 GTS, 2015 WL 5512039, at *5 (N.D.N.Y. Sept. 15, 2015) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). "Where objective medical evidence does not indicate that a claimant suffers from an alleged impairment, the impairment is not medically determinable." Kimberly M. v. O'Malley, No. 3:23-CV-302-CRS-RSE, 2024 WL 3691696, at *2 (W.D. Ky. Aug. 7, 2024). See Kirkland v. Saul, No. 4:20-CV-1753, 2021 WL 2935074, at *4 (S.D. Tex. Apr. 27, 2021), adopted, No. 4:20-CV-01753, 2021 WL 2514058 (S.D. Tex. June 18, 2021) (finding that plaintiff's subjective complaints coupled with a prescription for anxiety medications was not enough to establish a medically determinable impairment).

---

[22] Cleveland Clinic, *Mast Cell Activation Syndrome*, (June 17, 2026) https://my.clevelandclinic.org/health/diseases/mast-cell-activation-syndrome.

Here, plaintiff provided no objective medical evidence from an acceptable medical source that she suffered from MCAS during the relevant time period prior to the time the ALJ issued its decision. First, Dr. Kroopnick's retrospective opinion cannot be considered because it was not in the administrative record at the time the ALJ made his decision. Next, plaintiff's statement that doctors believe she "might have has mast cell activation all along" is insufficient; speculation that a patient "might" have had a condition does not establish a medically determinable impairment. Finally, the scientific articles provided by plaintiff are insufficient to identify a medically determinable impairment. The articles do not make conclusive findings that MCAS causes vulvodynia, nor do they address plaintiff's specific circumstances.

Because there was not substantial evidence in the record at the time the ALJ issued its decision that MCAS was not a medically determinable impairment for plaintiff, the ALJ did not err.

**5. Whether the ALJ's Credibility Determination Lacks Substantial Evidence**

Plaintiff next argues that the ALJ's reasoning was flawed when he found plaintiff's testimony "not entirely consistent" with the record because the medical evidence "does not include any complaints by claimant that she is unable to sit or stand for more than a short period." Docket No. 9, at 19. Plaintiff argues that the ALJ's reasoning was flawed for the following reasons: (1) the ALJ acknowledged that the record "contains very little evidence" from the relevant period; (2) the claimant explained that many records were

destroyed; and (3) the absence of specific complaints in limited records is not substantial evidence that the symptoms did not exist—especially for a condition like vulvodynia where pain with sitting is a defining characteristic. Id. See Halverson v. Astrue, 600 F.3d 922, 931-32 (8th Cir. 2010) ("[T]he ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.").

Plaintiff's arguments are without merit. Plaintiff's statements regarding the severity of her symptoms during the relevant time period are inconsistent with the sparse contemporaneous medical evidence. While plaintiff did complain at her February 2003 appointment of vulvodynia and vaginal pain, she did not mention issues with sitting or standing longer than 30 minutes. AR367. At an August 2004 appointment regarding pregnancy and childbirth, plaintiff noted she was "doing well" and had no prenatal complications. AR968, 976. In April of 2007, plaintiff was seen for pain under her eyes from a sinus infection; providers noted that plaintiff was "otherwise doing well." AR1046, 1054. None of this evidence supports plaintiff's testimony regarding the severity of her symptoms, such as a sitting limitation.

Plaintiff cannot fail to provide evidence and then rely on her own failure to demonstrate why she is entitled to disability benefits, particularly where the burden of proof rests on her shoulders. The ALJ analyzed what little contemporaneous evidence there was and found that it contradicted plaintiff's testimony. The court finds that the ALJ's credibility determination was not erroneous based on the evidence that was in the record at the time.

### 6. Whether New Evidence Warrants a Sentence Six Remand

After the ALJ wrote his opinion, plaintiff's attorney sent Dr. Kroopnick a letter soliciting additional information. AR41. Specifically, plaintiff's attorney asked Dr. Kroopnick to elaborate on his relationship with plaintiff prior to 2008. AR42. Dr. Kroopnick responded that he treated plaintiff prior to 2008, that he believes she was suffering from MCAS during that period, and that plaintiff's condition would have required severe work limitations such as being off task 25% or more, missing more than four days of work per month, and taking frequent breaks. AR43-44.

Dr. Kroopnick's supplement was submitted to the Appeals Council after November 2, 2024. AR45; Docket No, 9, at 4. Because the ALJ issued his decision on July 24, 2024, the ALJ had no opportunity to review or consider Dr. Kroopnick's supplement.

The new information is substantial. The fact that Dr. Kroopnick says he treated plaintiff during the relevant time period significantly undermines the ALJ's basis for finding Dr. Kroopnick's opinion to be unpersuasive. While the ALJ found other errors with Dr. Kroopnick's opinion, such as his failure to provide a description of supportive medical findings, a significant basis for the ALJ's discounting Dr. Kroopnick's opinion was that he did not reference the relevant time period or provide evidence that he treated plaintiff during that period. AR16. The newly provided evidence ameliorates some of those concerns.

In cases like this, a sentence six remand is appropriate. 42 U.S.C. § 405(g) provides that "the court may . . . at any time order additional evidence

to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." In contrast to a sentence four remand, sentence six "authorizes a remand . . . where new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Brett M. v. Saul, 611 F. Supp. 3d 771, 785 (D.S.D. 2020) (quoting Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000)).

The court finds that both requirements for a sentence six remand are met. First, there is good cause for plaintiff submitting this evidence after the administrative proceedings. The evidence was only discovered after plaintiff's attorney wrote Dr. Kroopnick a letter requesting supplementation based on the ALJ's explanation why Dr. Kroopnick's initial evaluation was inadequate. The government does not dispute that there is good cause. See Docket No. 14, at 23.

The government does contend, however, that the evidence is not material. Id. Evidence is material where it is "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination." Whitman v. Colvin, 762 F.3d 701, 708 (8th Cir. 2014).

The government states that "Dr. Kroopnick's clarification that he treated plaintiff as a young girl does not cure the deficiencies in his 2023 opinion," and

therefore would not have altered the Commissioner's determination. Docket No. 14, at 23. Specifically, the government states that "the ALJ found Dr. Kroopnick's opinion unpersuasive primarily because it lacked supportability and consistency with the record evidence." Id. (citing AR16). The government continues:

> There was no description of supportive medical findings, no reference to the relevant time period or findings from that period, and no objective evidence connecting the extreme functional limitations to Plaintiff's presentation during the period under review. The November 2024 clarification provides no additional treatment notes or specific medical findings, does not explain what specific treatment Dr. Kroopnick provided, or how frequently the doctor saw Plaintiff. In short, it does not tie the 2023 checklist opinion to any specific findings from the insured period. The ALJ's analysis of the 2023 opinion remains valid even considering the clarification.

Id.

It is true that there were multiple deficiencies with Dr. Kroopnick's 2023 report mentioned by the ALJ. As the ALJ wrote, Dr. Kroopnick did not provide a description of supportive medical findings for his conclusion that plaintiff was incapable of even sedentary work and would be absent five days each month and off task 50% of the time. AR16. However, a primary reason the ALJ provided for discrediting Dr. Kroopnick's report was that he did "not reference the relevant time period" and that "there is no evidence Dr. Kroopnick even knew the claimant during the period at issue." Id.

Evidence need not certainly change an outcome to be material; rather, evidence need only have a "*reasonable likelihood* that it would have changed the Commissioner's determination." Whitman, 762 F.3d at 708 (emphasis

added). The court finds that there is a reasonable likelihood that the Commissioner's determination would have been different had he been assisted by Dr. Kroopnick's supplemental report. Accordingly, a sentence six remand is warranted pursuant to 42 U.S.C. § 405(g).

On remand, the ALJ is instructed to consider Dr. Kroopnick's November 2024 supplement. In considering the supplement, the ALJ is instructed to consider how the new information affects the analysis at step two through five of the analysis for determining disability.[23] The ALJ is specifically instructed to consider whether this new information changes his original analysis regarding: (1) Dr. Kroopnick's retrospective medical opinion, (2) the severity of plaintiff's symptoms, (3) whether MCAS is one of plaintiff's medically determinable impairments, and (4) plaintiff's RFC. The court does not comment on what the appropriate resolution of these issues will be; rather, the court simply notes that the issues should be reconsidered in light of Dr. Kroopnick's November 2024 supplement.

**E. Type of Remand**

Plaintiff requests reversal of the Commissioner's decision with remand for further development. See Docket No. 18, p. 21. For the reasons discussed above, the Commissioner's denial of benefits is supported by substantial evidence; however, pursuant to sentence six of 42 U.S.C. § 405(g), the court orders that additional evidence be taken before the Commissioner of Social

[23] The ALJ need not revisit step one—substantial gainful activity—because the new evidence does not impact the step one inquiry.

Security—specifically, Dr. Kroopnick's supplemental report from November 2024.

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g). "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406 F.3d 962, 964 (8th Cir. 2005)). It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)). A sentence six remand authorizes a court to "order additional evidence to be taken before the Commissioner of Social Security." 42 U.S.C. § 405(g)).

A sentence six remand is an interlocutory and non-appealable order, as the district court retains jurisdiction over the action pending further development and consideration by the ALJ. Butts v. Barnhart, 388 F.3d 377, 384 n.4 (2d Cir. 2004), as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005). "The court retains jurisdiction in a Sentence Six remand, and enters final judgment only after post-remand agency proceedings have been completed and their results filed with the court." Bellmore-Byrne v. Comm'r of Soc. Sec., No. 15-CV-11950, 2016 WL 5219541, at *3 (E.D. Mich. Sept. 22, 2016) (quotation omitted).

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby:

ORDERED that the case is remanded to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g) for further proceedings consistent with this order.

DATED this 27th day of August, 2026.

BY THE COURT:

Veronica L. Duffy

VERONICA L. DUFFY
United States Magistrate Judge